Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| | | | |
|---|---|---|---|
| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | |
| **CASE NUMBER** | 98 C 3555 | **DATE** | 3/19/2002 |
| **CASE TITLE** | Randy Smith, et al. vs. Northeastern IL University, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due ______.

(3) ☐ Answer brief to motion due______. Reply to answer brief due______.

(4) ☐ Ruling/Hearing on ______ set for ______ at ______.

(5) ■ Status hearing is set for April 11, 2002 at 9:30 a.m.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on ______ set for ______ at ______.

(7) ☐ Trial[set for/re-set for] on ______ at ______.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to ______ at ______.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Order. In case number 98 C 3555, defendants' motion for summary judgment against plaintiff Guerrero [34-1] is granted. Defendants' motion for summary judgment against plaintiff Smith [37-1] is granted in part and denied in part. Defendants' motion for summary judgment against plaintiff Weaver [40-1] is granted. Defendants' duplicate motion for summary judgment [46-1] is denied as moot. Defendants' motion for summary judgment, in consolidated case number 98 C 5580, against plaintiff Reeves [26-1] is granted in part and denied in part. Defendants' motions to strike [63-1], [64-1], [65-1], [66-1], [67-1] in case number 98 C 3555 are either granted in part or denied in part on the merits, as discussed in this opinion, or, to the extent that the court does not rely on disputed evidence, denied as moot. A status hearing is scheduled for April 11, 2002 at 9:30 A.M.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| ☐ | No notices required, advised in open court. | | 1 number of notices | Document Number |
| ☐ | No notices required. | | MAR 22 2002 date docketed | 72 |
| ☐ | Notices mailed by judge's staff. | U.S. DISTRICT COURT CLERK | UMJ docketing deputy initials | |
| ☐ | Notified counsel by telephone. | 02 MAR 21 PM 1:55 | MAR 22 2002 date mailed notice | |
| ✓ | Docketing to mail notices. | FILED-ED-7 | UMJ mailing deputy initials | |
| ☐ | Mail AO 450 form. | | | |
| ☐ | Copy to judge/magistrate judge. | | | |
| RJ | courtroom deputy's initials | Date/time received in central Clerk's Office | | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RANDY SMITH, VICTORIA GUERRERO and ANN WEAVER, Plaintiffs, | ) | Case No. 98 C 3555 |
| v. | ) | |
| NORTHEASTERN ILLINOIS UNIVERSITY, GERALD LEENHEER and KEVIN CONNOLLY, Defendants. | ) | Judge Joan B. Gottschall |

DOCKETED
MAR 22 2002

**ORDER**

Plaintiffs Randy Smith, Elbert Lee Reeves, Victoria Guerrero, and Ann Weaver have filed suit against defendants Northeastern Illinois University ("NEIU"), Gerald Leenheer, and Kevin Connolly, alleging race discrimination and retaliation in violation of Title VII, 42 U.S.C. § 2000e; 42 U.S.C. § 1981; and 42 U.S.C. § 1983.[1] Defendants have moved for summary judgment on all counts.

**Background**

Plaintiffs all work in NEIU's Public Safety Department ("PSD"). They complain of discrimination, harassment, and retaliation on account of their race and/or due to their efforts to oppose racial discrimination. Smith and Reeves, both African-Americans, serve in NEIU's PSD as police officers. Weaver, also an African-American, works as an administrative aid, and

[1]This case began as two separate filings: case numbers 98 C 3555 and 98 C 5580. This court recently consolidated them.

72

Guerrero, a Latin-American, serves as a staff clerk.

In their second amended complaint, plaintiffs allege that Leenheer and Connolly, both lieutenants in the PSD, "have repeatedly harassed, threatened and allowed harassment, and threatening of black employees by their subordinates and have repeatedly harassed, threatened and allowed harassment and threatening by their subordinates of employees who supported action in opposition to discrimination by Defendants based on race." (Second Am. Compl. ¶ 9.) Therefore, plaintiffs allege that defendants "have created a hostile and offensive working environment for African-American employees and employees who opposed discrimination against African-American employees." (*Id.* ¶ 10.)

Plaintiffs' consolidated complaint consists of four counts. In Count I, Smith, Weaver, and Reeves charge NEIU with hostile work environment and intentional race discrimination in violation of Title VII; in Count II, they charge Leenheer and Connolly, both in their official and individual capacities, with hostile work environment and intentional race discrimination in violation of 42 U.S.C. § 1981. In Count III, all four plaintiffs raise allegations of retaliation against NEIU and Leenheer and Connolly, in violation of Title VII and § 1981, respectively. Finally, in Count IV, all four plaintiffs charge Leenheer and Connolly with violating 42 U.S.C. § 1983 and the First Amendment by "depriving [them] of their ability to complain about their unfair treatment and by subjecting employees to a hostile work environment or harassment by fellow employees because of their having exercised their rights under the First and Fourteenth Amendments." (Second Am. Compl. ¶ 67.)

On September 13, 1999, this court denied defendants' motion to dismiss the complaint

filed by plaintiffs Smith, Weaver, and Guerrero in original case number 98 C 3555. *Smith v. NEIU*, No. 98 C 3555 (N.D. Ill. Sept. 13, 1999) (Mem. Op. & Order of 9/13/99). In its memorandum opinion and order, the court concluded that the three plaintiffs had collectively alleged a hostile working environment. In addition, the court held that each plaintiff had sufficiently alleged a specific claim of retaliation and First Amendment violation. *Id.* Now before the court is defendants' motion for summary judgment on all counts. Defendants filed four separate motions against the four plaintiffs, supported by separate briefs, fact statements, and exhibits. Plaintiffs, in response, filed a single set of documents addressing all four motions for summary judgment. The court will address each motion in this opinion.[2]

**Discussion**

Defendants' arguments as to each plaintiff are quite similar for each count. As to Counts I and II, defendants claim that neither Smith, Weaver, nor Reeves sufficiently sets forth a prima facie case of race discrimination or hostile work environment under Title VII or § 1981. They also claim that Weaver is barred altogether from raising her Title VII claim. As to Count III, defendants claim that none of the four plaintiffs can point to an adverse employment action that can be linked to a protected activity, as required in a retaliation claim under both Title VII and § 1981. Finally, as to Count IV, defendants argue that each plaintiff has failed to show that defendants interfered with his or her constitutionally protected rights to free speech. The

[2]Defendants have also filed five motions to strike various exhibits and segments of documents filed by plaintiffs in opposition to defendants' motions for summary judgment. The court will address the issues raised by those motions as they arise in this opinion.

court will discuss each in turn.

**I. Count I: Race Discrimination under Title VII**

In Count I, plaintiffs Smith, Reeves, and Weaver have charged NEIU with hostile work environment discrimination in violation of Title VII. Specifically, they claim that NEIU "intentionally discriminated against Plaintiff [sic] based on their race permitting and allowing a hostile environment against blacks and disparate treatment of blacks." (Second Am. Compl. ¶ 44.) Defendants vigorously oppose this claim on summary judgment. Each party has also addressed whether each plaintiff should withstand summary judgment on individual claims of intentional race discrimination under Title VII.

A. Hostile Work Environment

It is well accepted that Title VII allows a cause of action for racial harassment that creates a hostile or offensive work environment. *See, e.g., Duhart v. Fry*, 957 F. Supp. 1478, 1491 (N.D. Ill. 1997). Title VII "addresses more than simply economic or tangible discrimination; it instead reaches 'the entire spectrum of disparate treatment of men and women in employment,' which includes conduct having 'the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.'" *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1453 (7th Cir. 1994) (quoting *Meritor Savings Bank FSB v. Vinson*, 477 U.S. 57, 64-65 (1986)). The statute is violated "when the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting

*Meritor*, 477 U.S. at 65, 67).

"[W]hile employers are vicariously liable for hostile environment [racial] harassment by supervisors (subject to certain defenses), a plaintiff must show negligence in order to hold an employer liable for co-worker harassment." *Silk v. City of Chicago*, 194 F.3d 788, 804 (7th Cir. 1999) (internal citations omitted). Thus, the first issue is whether the alleged hostile work environment was created only by coworkers of Smith, Reeves, and Weaver, or whether it was caused by a supervisor.

Defendants claim that "[t]he alleged hostile environment towards [plaintiffs] was due primarily to the conduct of [their] coworkers." (Defs.' Mem. Supp. Mot. Summ. J. against Randy Smith ("Mem. against Smith") at 12; Defs.' Mem. Supp. Mot. Summ. J. against Elbert Lee Reeves ("Mem. against Reeves") at 6.) The closest that plaintiffs come to a response to this argument is their claim that "conduct is attributable to the employer when the conduct at issue occurred at the hands of supervisors." (Pls.' Joint Mem. Opp'n Defs.' Mot. Summ. J. ("Pls.' Resp.") at 15.) Thus, it appears that plaintiffs argue that Leenheer and Connolly were supervisors of all plaintiffs during the incidents in question. Unfortunately, neither party has pointed to any evidence to support their respective claims. However, a brief review of the record reveals a genuine issue of material fact regarding this issue. On March 29, 1995, Smith filed a discrimination charge with the Illinois Department of Human Rights, alleging, inter alia, that "[NEIU] has pattern [sic] of discriminating against black employees at work. I have repeatedly complained about this behavior and questioned supervisors, especially Sergeant Jerry Leenheer

(white)." (Smith Discrimination Charge, Pls.' Ex. 11.)[3] This evidence tends to show that Leenheer was, in fact, Smith's supervisor during the events in question. Furthermore, Reeves testified in his deposition that, during the alleged discrimination, both Leenheer and Connolly gave assignments to police officers, including Reeves and Smith. (Reeves Dep., Pls.' Ex. 37, 35:22-24 –36:1-2.) Reeves also testified that Leenheer and Connolly disciplined Smith and Reeves. "To be a true supervisor, one must be entrusted with at least some of the power to hire, fire, demote, promote, transfer, or discipline–authority of a substantial magnitude." *Jones v. Illinois Dep't of Transp.*, No. 99 C 0266, 2001 WL 1545882, *3 (N.D. Ill. Nov. 27, 2001) (internal quotations omitted). Viewing the evidence in the light most favorable to plaintiffs, the court infers that Leenheer and Connolly were supervisors to Smith and Reeves, not merely coworkers.[4]

Plaintiffs must demonstrate that a rational trier of fact could find that their workplace was permeated with discriminatory conduct–intimidation, ridicule, insult–that was sufficiently severe or pervasive to alter the conditions of their employment. "We have recognized, however, that harassment need not be both severe and pervasive--one extremely serious act of harassment

---

[3]Defendants object to the admissibility of this evidence on summary judgment because the cited complaint refers to incidents that fall outside the scope of the applicable statute of limitations. While defendants' argument may have merit with regard to Smith's reliance on the *events* that are the subject of the 1995 complaint, the court finds no evidentiary problems with using the document for the limited purpose of determining whether Leenheer was Smith's supervisor.

[4]It is less clear whether Leenheer and Connolly were supervisors to plaintiff Weaver, who was not an officer but rather worked with the clerical staff. However, because the court concludes in the discussion below that Weaver has failed to set forth a prima facie case of hostile work environment, the court need not resolve this issue.

could rise to an actionable level as could a series of less severe acts." *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 693 (7th Cir. 2001). "Title VII is not directed against unpleasantness per se but only . . . against discrimination in the conditions of employment." *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 885 (7th Cir. 1998) (quoting *Carr v. Allison Gas Turbine*, 32 F.3d 1007, 1009 (7th Cir. 1994)). Therefore, the court should consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

To establish an alteration in the terms or conditions of their employment or "an adverse employment action," plaintiffs must demonstrate either (1) a tangible employment action (such as discharge, demotion, or undesirable reassignment) or (2) a non-tangible action such as discriminatory conduct which is so severe or pervasive that it creates an abusive working environment. *Silk*, 194 F.3d at 804-05. Moreover, the abusiveness of the working environment must qualify both objectively and subjectively. *Id.* at 805. That is, it must be an environment that a reasonable person would find hostile or abusive and that these particular employees subjectively perceived to be abusive. *Id.* If the court concludes that the discriminatory conduct created an abusive working environment, the employer's liability is triggered. In deciding whether the employer can be held liable for the supervisor's harassment, the court applies the holdings set forth in two Supreme Court cases:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible

> employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c). . . . No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807-08 (1998).

The court notes at the outset that plaintiffs have provided substandard documents to support their opposition to defendants' motion for summary judgment. Their joint response brief contains arguments that lump all four plaintiffs together. Plaintiffs state: "The issue is whether the combined experience created a hostile work environment, not whether each discrete incident, standing alone, supports a claim for recovery." (Pls.' Resp. at 15-16.) This argument is correct, but only when considering each *individual* plaintiff. In other words, each plaintiff must provide arguments as to why he or she specifically has suffered a hostile work environment. *Cowan v. Prudential Ins. Co. of Am.*, 141 F.3d 751, 757 (7th Cir. 1998) ("[A] plaintiff cannot rely on what another plaintiff claims to be offensive if it is not also offensive to the plaintiff.").

Furthermore, plaintiffs' response brief comes close to a violation of Local Rule 56.1, which requires that plaintiffs provide both a statement of facts in response to defendants' fact statement, citing supporting materials in the record, and a memorandum of law. Plaintiffs have filed their required fact statements and legal memorandum. However, the response brief contains a laundry list of factual allegations, followed by an "argument" section, in which plaintiffs make conclusory, one-sentence arguments. For example, on page 14 of their response brief, plaintiffs argue that the "evidence shows that the remarks of Lt. Leenheer and others against African

Americans and those who opposed discrimination tainted the employment decisions in this case and created a hostile environment the Plaintiffs were forced to work in." (Pls.' Resp. at 14.) However, plaintiffs do not explain what "remarks" they refer to, nor do they point to any other evidence following this sentence that supports their argument. Apparently, plaintiffs expect the court to refer to the litany of facts recited at the beginning of their brief and decide which best supports their various general arguments. It is not the task of the district court "to scour the record in search of a genuine issue of triable fact. We rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." *Richards v. Combined Ins. Co. of Am.*, 55 F.3d 247, 251 (7th Cir. 1995). On the other hand, plaintiffs have filed all of the documents required by Local Rule 56.1, and have at least tenuously complied with its requirements of specific record citation. With this in mind, the court will consider plaintiffs' general arguments and make reasonable attempts—without doing the work plaintiffs' counsel should do—to find genuine issues of fact or confirm their absence.

1. *Smith*

First, the court will address the "remarks of Lt. Leenheer and others against African Americans."[5] (Pls.' Resp. at 14.) Plaintiffs claim that racially derogatory jokes and

---

[5]Defendants vigorously object to the admissibility of any evidence of Leenheer's remarks because it is hearsay. Fed. R. Evid. 802. Defendants are both right and wrong, depending on when this evidence is being used. For example, plaintiffs have submitted affidavits of at least four witnesses who claim that they heard relevant remarks by Leenheer. This evidence is admissible to show that Leenheer did, in fact, utter these remarks because they qualify as an admission by a party-opponent. Fed. R. Evid. 801(d)(2). Additionally, there is evidence that some witnesses told certain plaintiffs about Leenheer's comments. To the extent that the evidence is offered only to show that the listener heard and understood the intermediary-witness, this is also

stories were persistently told on the third watch. However, Smith has admitted that he did not know who the officers on the third watch were and that he never heard any of the jokes. "Mean-spirited or derogatory behavior of which a plaintiff is unaware, and thus never experiences, is not 'harassment' of the plaintiff (severe, pervasive, or other)." *Mason v. S. Illinois Univ.*, 233 F. 3d 1036, 1046 (7th Cir. 2000) (citations omitted).

On the other hand, the content of the comments overheard by witnesses is significant. Weaver testified at her deposition that she was constantly approached by her student staff members who complained that Leenheer called Smith and Reeves "derogatory names such as 'black niggers' and talking about them losing their jobs. . . . The students were scared." (Weaver Dep., Pls.' Ex. 39, 44:19-24.) Unfortunately for Smith, in addition to the admissibility problems with this evidence, he admitted that he did not know that Weaver's students made these complaints. Instead, Smith heard about the comments through general rumors. "What I remember is I always got things in rumor on talks about me. . . . People have said, Watch your back, and all this." (Smith Dep., Defs.' Smith Ex. 2, 81:18-21.) Although it is relevant that Smith heard these rumors, *Mason*, 233 F.3d at 1046 (citations omitted), without more evidence it is not sufficient to establish his claim. *Miranda v. Chicago Hous. Auth.*, No. 97 C 8447, 2000 WL 134756, *9 (N.D. Ill. Feb. 2, 2000) (where the plaintiff claimed that coworkers told him about

---

admissible. Fed. R. Evid. 801(c). However, any testimony by a plaintiff that he or she heard about comments by Leenheer from other witnesses, which is offered to show what Leenheer actually said, is inadmissible hearsay. *See Cowan*, 141 F.3d at 761. Therefore, defendants' motions to strike plaintiffs' exhibits and fact statements containing this evidence are granted in part and denied in part.

racist comments outside his presence, noting that "[n]ot only is this hearsay evidence inadmissible, but it is insufficient to demonstrate that Plaintiff was exposed to a hostile work environment").

The only comment that Smith testified that he actually heard Leenheer say was "he don't like working with the nigger anyway." (Smith Dep., Pls.' Ex. 40, 67:21-22.) Although this evidence is offensive, by itself it is not sufficient to withstand summary judgment on a hostile environment claim. *See McPhaul v. Bd. of Comm'rs*, 226 F.3d 558, 567 (7th Cir. 2000) (the "mere utterance of [a racial] epithet which engenders offensive feelings in an employee" is not sufficient to establish a hostile working environment) (citations omitted). However, despite Smith's conclusory statement to the contrary, this is not the only evidence on which Smith relies.

Smith also complains that the PSD was divided into an "A Team" and a "B Team." (Pearson Dep., Pls.' Ex. 35, 11:9-14.) Officer Dwight Pearson testified that the A Team consisted of Mike Hamidel, Hopeton Rowe, Bob Paprocki, Chris Leenheer, Director William Curtin, Officer Leyva, and defendants Leenheer and Connolly. Each member of the A Team is white except Hopeton Rowe and perhaps Leyva. Leyva apparently self-identifies as Hispanic, although Pearson described him as white. Defendants claim that Rowe is black, which proves that the two teams are not divided along racial lines. *See Smith v. Sheehan*, 189 F.3d 529, 533 (7th Cir. 1997) ("To be actionable, the offensive conduct must be based on one of the characteristics protected by Title VII," such as race). However, the fact that one black person was a member of the A Team does not destroy the inference that Leenheer and Connolly engaged in discriminatory conduct against Smith and Reeves. The fact still remains that the A

Team was predominantly white. *Cf. Bush v. Commonwealth Edison Co.*, 990 F.3d 928, 931 (7th Cir. 1993) ("To be free from discrimination is an individual rather than a group entitlement.") (citations omitted).[6]

The B Team included Derrick Spenser, Dwight Pearson, and plaintiffs Smith and Reeves, each of whom is black. Other B Team members were Donna Higgins and Gene Salecker, who are both white but who opposed racial discrimination. Viewing the evidence in the light most favorable to Smith, the court will assume that the B Team consisted predominantly of those who either were African-American or opposed racial discrimination and the A Team predominantly included those who fit neither of those categories.

Dwight Pearson testified that the "A Team, the team supposedly in power, could do, basically, whatever they wanted, whereas the B Team was limited as to what they could do. They were, basically, in fear of doing anything, whereas they could be penalized for it or suspended for whatever they maybe done." (Pearson Dep., Pls.' Ex. 35, 16:6-12.) For example, Pearson testified that Reeves was disciplined for supposedly sleeping in a room, while A Team members who were sleeping in plain view were never disciplined. In addition, Pearson testified that B Team members would be assigned to the unwanted desk position despite their seniority. Reeves testified that Leenheer and Connolly "would assign black officers, myself and Officer Smith who were senior, to the desk. Junior white officers were not." (Reeves

[6]Furthermore, plaintiffs claim that Rowe called himself a Jamaican and does not consider himself to be black. This suggests that Leenheer and other A Team members may also have believed that he is not black. Although Rowe's statement that he is not black may be hearsay if offered for its truth, plaintiffs offer it here for its effect on listeners such as Leenheer.

Dep., Pls.' Ex. 37, 36:2-4.) In another example, Pearson testified that A Team members would constantly leave a certain computer lock on, apparently contrary to regulations, during their shifts at the desk position, but Reeves was almost suspended for doing the same thing. Reeves also testified that "[w]hite officers could leave the boundaries of the campus on a routine basis without any suspensions. When I did it, . . . I was suspended, myself and Officer Smith." (Reeves Dep., Pls.' Ex. 37, 36:4-8.)

Finally, Pearson testified that A Team members would often get assigned as acting watch commander during shifts, despite the seniority of B Team members, contrary to department regulations. The acting watch commander earned more overtime pay. Specifically, Pearson testified that Officer Leyva, who is not black, was assigned as acting watch commander despite having much less seniority than Pearson. "Officer Leyva, who had become the lieutenant, he treated most minority or Black officers there in total disregard. And it was accepted by the chief and other personnel there. They knew what was going on, and they allowed it and did nothing about it. And if you complained, again, there might be some discipline that you would receive for complaining." (Pearson Dep., Pls.' Ex. 35, 27:17–28:2.) Viewing the evidence in the light most favorable to Smith, the court can infer that Smith was aware of the racial distinction between the A Team and the B Team and all of the alleged resulting discrimination. *See Cowan*, 141 F.3d at 757 ("[O]nly harassment which subjectively offends the plaintiff is actionable."); *cf. Pryor v. Seyfarth, Shaw, Fairweather & Geraldson*, 212 F.3d 976, 978 (7th Cir. 2000) (holding that plaintiff could not rely on the affidavit of a third person who alleged that she was harassed by the same individual where it appeared the plaintiff had no knowledge of that incident).

Smith also claims that on several occasions, he was falsely accused of wrongdoing by NEIU, while white officers under similar circumstances were not suspected. Briefly, these incidents include: (1) a warning for parking in a handicapped parking spot; (2) an accusation of withholding information during an investigation; (3) a requirement that Smith submit to a psychological evaluation to remain employed; (4) a negative job evaluation by Connolly in 1998; (5) Smith's removal from his position as acting watch commander for allegedly leaving his patrol; and (6) Smith's 10-day suspension, for allegedly leaving his patrol and other reasons.

Defendants correctly point out that Smith has failed to provide any evidence (other than his conclusory statements in a previous discrimination charge) that similarly situated white employees were treated differently in four of these instances. "It is now quite well-established that, in order to withstand a motion for summary judgment, the party opposing the motion must present 'affirmative evidence' to support his/her position; a mere 'scintilla of evidence' is insufficient." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 584 (7th Cir. 1992) (citations omitted).

However, Smith withstands this argument with regard to his removal from his position as acting watch commander and subsequent suspension resulting from the accusation that he left his patrol area without authorization. First, Smith claims that Mohammed Hamideh, a non-black officer, left his patrol area many times without authorization and has not been disciplined. However, he supplies no facts to rebut defendants' claim that Hamideh was, in fact, authorized to be outside the boundaries. On the other hand, Reeves testified that he researched computer files and discovered that "other officers were leaving the campus circumference and not being warned or punished." (Reeves Dep., Pls.' Ex. 37, 34:14-15.) He specifically cites Leenheer

as one of those officers. Defendants dispute this fact, but do not point to sufficient evidence to support their claim.[7] This creates a genuine dispute as to whether Smith was treated differently from non-African-American officers.

Defendants also argue that there was a legitimate reason for Smith's 10-day suspension, namely, that he was actually guilty of the cited infraction. Specifically, defendants argue that Smith and Reeves frequented a video game room called Diversions. In January and February 1997, Leenheer and Connolly investigated Smith and Reeves's behavior. On March 7, 1997, Lieutenant Hill, a black man, removed Smith from his acting watch commander duties based on Leenheer and Connolly's investigation. On November 11, 1997, Smith was suspended for, among other things, multiple unauthorized absences from the work site, namely, his time spent at Diversions. Smith, however, denies that he was not authorized to visit Diversions. In fact, he claims that he was encouraged to do so by Curtin, who wanted "more police community contact."[8]

---

[7]Defendants also move to strike plaintiffs' fact statement regarding this issue. Specifically, defendants argue that Reeves's additional fact number 324 is narrative, argumentative, or conclusory. The court recognizes that defendants' argument has some merit, and notes that Reeves will have to provide foundation and prove his claim at trial. However, his deposition testimony supplies enough particular facts that the court will not ignore the fact statement altogether at the summary judgment stage.

[8]Defendants object to the evidence supporting this claim, arguing that it is a conclusory statement in Smith's affidavit lacking sufficient foundation. Specifically, Smith averred that he was "authorized to visit Diversions and was encourgaed [sic] to do so by Curtin who wanted more police community contact." (Smith Aff., Pls.' Ex. 32 ¶ 4.) Federal Rule of Civil Procedure 56(e) requires that affidavits offered in opposition to summary judgment "be made on personal knowledge, . . . set[ting] forth such facts as would be admissible in evidence, and . . . show[ing] affirmatively that the affiant is competent to testify to the matters stated therein." Smith's statement about what Curtin said is not sufficiently conclusory to justify its rejection. *Compare, e.g., Drake*, 134 F.3d at 887 (holding that district court was correct to disregard an allegation that stated: "Management, especially Dean Coleman, took a scapegoat approach in dealing with

(Smith Aff., Pls.' Ex. 32 ¶ 4.) On summary judgment, the court is unable to comment on the credibility of sworn testimony. The court can only decide whether this testimony creates a genuine issue as to whether Smith was, in fact, authorized to visit Diversions. If Smith was authorized to visit Diversions, but was suspended for this allegedly legitimate behavior, the fact finder might infer that discrimination at NEIU culminated in his suspension.[9]

Because Smith's claim against NEIU is grounded in vicarious liability, the court must now consider whether Smith's suspension constitutes a "tangible employment action." *Silk*, 194 F.3d at 804. Defendants argue that none of Smith's cited incidents constitute such an adverse employment action. Defendants are correct as to the first four incidents. *Crady v. Liberty Nat'l Bank & Trust Co. of Indiana*, 993 F.2d 132, 136 (7th Cir. 1993) (an adverse action is something more than "a mere inconvenience or alteration of job responsibilities"). However, at least Smith's 10-day suspension, which included loss of pay, constitutes an adverse

---

employee problems and generally tended to cover up matters"). As with Reeves's testimony regarding white officers who left their patrol area, Smith's claim is particular enough that the court will not ignore it.

[9]Significantly, on September 18, 1997, the Illinois Department of Human Rights ("IDHR") dismissed Smith's claim of racial discrimination regarding his March 1997 demotion. Smith conceded that he frequented Diversions and played video games. Furthermore, the IDHR found that Diversions was outside the patrol area, that Hamideh was authorized to leave the boundaries, and that comparable white employees were demoted for similar policy violations. (IDHR Investigation Report, Defs.' Smith Ex. 22 B, at 1, 7.) Nevertheless, Smith disputes the findings of the IDHR, and Reeves's testimony provides a (somewhat) plausible dispute as to whether similarly situated white employees were treated the same. A jury may, in fact, agree with Smith's version of events.

employment action.[10] *Id.* ("A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation."); *see also Ellerth*, 524 U.S. at 765 (1998); *Faragher*, 524 U.S. at 807-08 (defining tangible employment action as "discharge, demotion, or undesirable reassignment"). Therefore, this incident constitutes a tangible employment action, as required to set forth a prima facie case of vicarious liability for hostile work environment, and to preclude affirmative defenses by NEIU. *Silk*, 194 F.3d at 804.

Viewing all of the evidence in the light most favorable to Smith, the court must deny defendants' summary judgment motion. Smith may be able to prove that (a) Leenheer and Connolly were his supervisors; (b) he heard Leenheer call him a "nigger"; (c) he was told about the racially derogatory comments made by Leenheer and Connolly; (d) the A Team and B Team were racially divided; (e) black officers in general were routinely disciplined while white officers were not; and (f) Smith was punished for leaving his patrol area while similarly situated non-black officers were not. If Smith proves these disputed facts, then he will have established a hostile work environment, both objective and subjective. Furthermore, because Smith will have demonstrated a tangible employment action, defendant NEIU is vicariously liable and may not raise any affirmative defenses. *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807-08. Therefore, defendants' motion for summary judgment is denied as to Smith's hostile work

---

[10]The court will articulate no opinion as to whether Smith's removal from his position as acting watch commander constitutes an adverse employment action.

environment claim in Count I.

2. *Reeves*

Reeves's hostile work environment claim is similar to Smith's. First, Reeves has admitted that he has not heard any derogatory racial remarks firsthand. However, in 1993 Reeves prepared a complaint of discriminatory practices in which he stated that "[f]ormer student aide Greg Salecker stated to me that when he worked on Gerry Leenheer's watch he would always hear them (meaning Gerrys [sic] Cronies) telling racist jokes." (Mem. from Lee Reeves to Dep't of Labor, May 10, 1993, Pls.' Ex. 9 at 2.) Plaintiffs have provided an affidavit by Salecker testifying that he did, in fact, hear Leenheer make racist remarks.[11] (Salecker Aff., Pls.' Ex. 26 ¶¶ 7, 9.) Thus, to the minimal extent it is helpful, there is evidence that Reeves was aware of Leenheer's derogatory racial remarks.

Reeves also complains about being relegated to the B Team. He provides more specific examples of discrimination against him personally: (1) he was disciplined for supposedly sleeping in a room whereas A Team members who were openly sleeping were not penalized; (2) he was

---

[11]Defendants object to these documents because, among other things, they refer to events that occurred outside the applicable statute of limitations. However, the court relies on this evidence only for its relevance as to whether Reeves was aware of Leenheer's comments, not whether Leenheer discriminated against Reeves at the time they were uttered. Furthermore, the Seventh Circuit has recognized a difference between claims of direct discrimination and hostile work environment on the issue of whether the complaint was timely filed. "It is commonly the case that the plaintiff must instead demonstrate that the harm about which she is complaining is part of a pattern of conduct, and she 'was reasonable not to perceive her working conditions as intolerable until the acts of harassment had, through repetition or cumulation, reached the requisite level of severity.'" *Russell v. Bd. of Trs. of the Univ. of Illinois at Chicago*, 243 F.3d 336, 343 (7th Cir. 2001) (quoting *DeClue v. Cent. Illinois Light Co.*, 223 F.3d 434, 435-36 (7th Cir. 2000)).

assigned to unwanted desk duty more than any other officer, although he had seniority; (3) he was disciplined for engaging the computer lock, whereas A Team members who did the same thing were not disciplined.

In addition, Reeves claims that despite the fact that he had been an officer for 10 years, Connolly ordered him to take "Field training," a program usually reserved for new hires. It is undisputed that Connolly did not recommend any other veterans for Field training. Reeves also claims that he was removed from his position as acting watch commander for the same reasons that Smith was removed—frequenting Diversions. On November 17, 1997, Reeves was suspended for 2 days for, among other things, being at Diversions without authorization and failure to properly perform supervisory responsibilities. Reeves argues, like Smith, that the charges against him were incorrect and that other white officers were not disciplined for similar behavior.

Finally, on May 18, 1998, charges were filed against Reeves seeking his discharge. The charges included, inter alia, "unauthorized entry, misrepresentations concerning [his] assigned duties, falsification, failure to perform assigned work, failure to follow [his] work schedule, failure to adhere to departmental regulations and 'loafing on the job.'" (Written Charges for Discharge, Pls.' Ex. 24.) Specifically, Reeves was accused of entering the office of the dean of education in violation of university rules so that he could "sit with [his] feet up and the curtains for the hallway windows closed." (*Id.*) He was also accused of lying about the incident to his superiors. After a hearing, the charges were withdrawn. However, the suspension pending discharge was converted to a 30-day suspension. Reeves argues that the

charges against him were false and that he was never involved in an unauthorized entry into a secured area. "They sought termination against me . . . for being in an unauthorized room hiding out. It wasn't true. I went to the merit board to absolve myself of these charges. I felt I was successful, and I was still given a 30-day suspension for the same thing." (Reeves Dep., Defs.' Reeves Ex. 2, 54:1-7.)

Viewing all the evidence in the light most favorable to Reeves, a reasonable jury could find that he was subjected to a hostile work environment. Although he never heard any alleged racial remarks, he was told about them. Furthermore, his allegations and evidence of B Team status include accounts of pervasive, frequent discrimination. Finally, a jury might conclude that the discrimination at NEIU culminated in either his 2-day suspension in November 1997 or his 30-day suspension in 1998. Each of these incidents constitutes an adverse employment action, sufficient to establish a hostile work environment and preclude affirmative defenses by defendant NEIU.

3. *Weaver*

Defendants argue that Weaver is barred from bringing a claim for racial discrimination under Title VII because she failed to raise this claim in her EEOC charge. It is true that a Title VII plaintiff may not bring claims in a lawsuit that were not included in her EEOC charge. *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994). On the EEOC form, when Weaver designated the form of discrimination that she was alleging, she only selected the box marked "Retaliation," and did not select the box marked "Race." (Weaver EEOC Charge, Defs.' Weaver Ex. 18.) However, the allegations in her EEOC charge include

many references to "racially motivated" conduct by defendants. (*Id.*) Therefore, the EEOC charge may have put defendants on sufficient notice that Weaver complained of a hostile work environment based on racial discrimination. However, the court need not resolve this issue because Weaver's hostile work environment claim fails, even considering all of her submitted evidence.[12]

In Weaver's deposition, she testified generally as to the discriminatory environment at the PSD, although she cited few events that concerned her personally. She testified that student aides under her supervision "were continuously complaining to me about the discrimination going on in our department." (Weaver Dep., Pls.' Ex. 39, 11:21-22.) Specifically, she testified that the employees under her supervision told her that Leenheer and Connolly "were constantly talking about Officer Reeves and Officer Smith and calling them derogatory names such as 'black niggers' and talking about them losing their jobs." (*Id.* at 44:17-20.) As discussed above, this evidence is only minimally helpful, if at all. *Miranda*, 2000 WL 134756, at *9 (where the plaintiff claimed that coworkers told him about racist comments outside his presence, noting that "[n]ot only is this hearsay evidence inadmissible, but it is insufficient to demonstrate that Plaintiff was exposed to a hostile work environment"). Weaver admitted that she "never heard Lieutenant Leenheer call Officer Smith or Officer Reeves a 'nigger.' I did hear him call them black motherfuckers." (*Id.* at 45:1-4.) Apparently, that is the only time that she personally

---

[12]Defendants also move to strike several exhibits used by Weaver to support her claims. The court need not resolve the issues raised in these motions because Weaver's claims fail, even when considering all of Weaver's submitted evidence. Therefore, defendants' motions to strike exhibits and fact statements used to support Weaver's claims are denied as moot.

heard either Leenheer or Connolly use a racially-motivated phrase. This evidence, by itself, does not establish a hostile working environment. *See McPhaul*, 226 F.3d at 567 (the "mere utterance of a [racial] epithet which engenders offensive feelings in an employee" is not sufficient to establish a hostile working environment). Furthermore, Weaver provides no evidence that Leenheer, Connolly, or anyone at NEIU referred to her personally using racially derogatory language. *See Cowan*, 141 F.3d at 758 ("[T]he impact of 'second-hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff") (internal quotation omitted). Unlike Smith and Reeves, Weaver has not provided enough additional evidence that at least creates a question as to whether she endured a hostile work environment.

a. Events prior to April 1997

On March 31, 1997, Weaver was advised by Delia Prondzinski (a.k.a. Delia Gomez), who was crying and upset, that Leenheer questioned her about a complaint filed against him and that she was intimidated by him. On April 9, April 11, and April 27, 1997, Weaver and plaintiff Guerrero, as well as Prondzinski and student aide staff members, drafted an affirmative action complaint and memoranda to Margo Smith. The memo cites several complaints: (1) misuse of computers by Leenheer's subordinates; (2) multiple criminal background checks by Leenheer, exclusively on black student aide applicants; (3) Leenheer's attempts to belittle Weaver with her subordinates and to instruct one white staff member to conduct procedures contrary to Weaver's policy; (4) Leenheer's profane complaint in Weaver's presence about Weaver's request to remove all lieutenants' access to her office; (5) Leenheer's request for a time-consuming update of a key list, followed by his refusal to use the list; (6) an alleged assault on Guerrero by an

officer; (7) harassment of Guerrero by officers; (8) Connolly's disruption of Guerrero and other clerical staff members' duties; (9) Connolly's refusal to train any clerical staff other than white members on updated technology in one instance; (10) Leenheer's intimidation of Prondzinski; (11) Leenheer's profane tirades regarding plaintiffs Smith and Reeves; (12) Leenheer's attempts to discover whether Smith and Reeves arrived to work on time.

The only evidence of possible racial discrimination provided by this list is Leenheer's insistence that black student aide applicants be subjected to multiple criminal background checks, Connolly's alleged preferential treatment of a white staff worker, and reports of Leenheer's racially derogatory comments regarding Smith and Reeves. None of these examples provide evidence of any actions directed against Weaver. *See Cowan*, 141 F.3d at 758 ("[O]nly two of the alleged incidents were directed at Cowan, and as this court has recognized, the impact of 'second-hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff.") (internal quotation omitted). The only evidence of actions that directly affected Weaver is the misuse of computers, Leenheer's attempts to undermine Weaver's supervisory authority, Leenheer's complaints about Weaver's request to lock officers out of her office, Leenheer's request for the key list and refusal to use it, and Leenheer's general profane outbursts to other officers. While this evidence certainly describes un unpleasant relationship between Leenheer and Weaver, it does not show racial discrimination. Unlike Smith and Reeves, Weaver fails to draw a link between the evidence suggesting that Leenheer directed some racial animus towards others and evidence that Leenheer harassed Weaver. "Title VII is not directed against

unpleasantness per se but only . . . against discrimination in the conditions of employment." *Drake,* 134 F.3d at 885 (citations omitted). Furthermore, while her complaints of Leenheer's profane tirades certainly show that her work was disrupted, they do not amount to an unreasonable interference with her performance. *Cf. Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995) (holding that the concept of sexual harassment was "not designed to purge the workplace of vulgarity"). Weaver's affirmative action complaints fail to provide sufficient evidence that the actions against her were racially motivated, and furthermore fail to provide any evidence of an adverse employment action or an alteration of the conditions of her employment.

b. Events Between April 1997 and March 1998

Weaver testified that "I felt that I was being retaliated against for discrimination that I had seen within . . . the department, and basically I wanted it to stop. It was deteriorating my life." (Weaver Dep., Pls.' Ex. 39, 11:19-24.) She continued: "It just got to the point where the environment people were quitting, getting–you know, threatening to quit. . . . [I]t was a very, very hostile environment that these people were considering that they were working in, and they were scared because of all the different things that was going on in the department." (*Id.* at 55:3-18.) On July 24, 1997, Prondzinski resigned because, among other reasons, "there is a lot of turmoil and stress within the department and I feel the situation has not been handled." (Letter of resignation of Delia Prondzinski, July 24, 1997, Pls.' Ex. 16.) These general statements provide little to bolster Weaver's claim.

On October 23, 1997, Weaver sent a memo to the vice president for administrative

affairs, complaining of continuing problems within the department and requesting that her department be physically moved. "These people are continuing to play games with us and are persisting in doing things to try and retaliate against us." (Mem. from Weaver to Cleve McDaniel, Oct. 23, 1997, Pls.' Ex. 17.) On February 6, 1998, Weaver claims that she and Guerrero were threatened by Leenheer, who said, "[t]hese two will be losing their homes," indicating Weaver and Guerrero. (Guerrero Dep., Pls.' Ex. 38, 28:11.) Assuming this was, in fact, a threat, this isolated incident, by itself, does not amount to a hostile work environment. "[I]solated and innocuous incidents will not support a hostile environment claim." *McKenzie v. Illinois Dep't of Transp.*, 92 F.3d 473, 480 (7th Cir. 1996). Furthermore, Weaver fails to show that the threat was racially motivated. On February 10, 1998, Weaver and Guerrero filed charges of retaliation and race discrimination with IDHR, complaining about the February 6 incident, among other things.

Weaver told the vice president that on February 20, 1998, she "[r]eceived several complaints and memo's [sic] from [her] clerical evening staff, that worked during Lt. Leenheer's shift yesterday. His uncontrolled outbursts and unprofessional behavior in the work place continues to promote fear and disruption . . . I can only hope that this administration would value the safety of its employees enough to take them out of harms [sic] way before this man explodes and injuries [sic] someone." (Mem. from Weaver to Cleve McDaniel, Feb. 20, 1998, Pls.' Ex. 21.) She claims that her numerous complaints were never satisfied. Weaver also claims that between April 9, 1997 (the date of the first affirmative action complaint) and March 18, 1998, she and Guerrero experienced "repeated acts of retaliation and a lack of any remedy by

the Defendant NEIU." (Pls.' Resp. at 11.) Without referring to any specific "acts of retaliation" in their response brief, plaintiffs cite their Exhibit 22, "Chronological listing of events regarding the affirmative action case." (*Id.*) A review of this document reveals no evidence of any acts of either retaliation or racial animus by defendants, and similarly provides no evidence of an adverse employment action, beyond the events listed in the April 1997 affirmative action charges.

c. Events after March 18, 1998

Finally, both Weaver and Guerrero received and generated memos detailing alleged harassment that occurred between May 8, 1998 and June 15, 1998. However, these documents also provide no evidence suggesting that Weaver was subjected to a racially hostile work environment. The only incident that was even directed toward Weaver in any way was discussed in a June 1, 1998 memo to Curtin, in which Weaver complains that Connolly refused to handle problems arising from ticket storage software on the PSD's computers, despite his duties to do so. All other events involved other employees, and Weaver fails to provide any inference of racial motivation in those incidents.

Even considering all of this evidence in the aggregate, Weaver has failed to set forth a prima facie case of hostile work environment racial harassment in violation of Title VII. Only a handful of her many allegations even hint at racial discrimination by anyone at NEIU. *See Smith v. Sheehan*, 189 F.3d at 533 ("To be actionable, the offensive conduct must be based on one of the characteristics protected by Title VII," such as race). The only real evidence of any racial animus concerns Weaver's allegation that Leenheer conducted more criminal background checks on black student aide applicants than white applicants. But this complaint, like so many others,

did not directly concern Weaver. She hints at discrimination when she mentions Leenheer's special treatment of and alleged conspiracy with a white clerical staff worker under Weaver's supervision. She also discusses complaints from her students about Connolly's and Leenheer's use of racial epithets when describing Reeves and Smith, and mentions that she heard Leenheer call them "black motherfuckers" one time. However, unlike Smith and Reeves, she utterly fails to furnish evidence that links the alleged racist behavior of defendants to any actions that affected her. Even considering every allegation that Weaver makes, there is insufficient evidence to create even an inference that the racial harassment at NEIU was so severe or pervasive that it either culminated in an adverse employment action against her or altered the conditions of her employment. Therefore, defendants' motion for summary judgment is granted as to Weaver's hostile environment claim in Count I.

B. Intentional Race Discrimination

1. *Smith and Reeves*

Defendants have raised arguments under Count I assuming that plaintiffs have brought both a hostile environment claim and an intentional discrimination claim in which each has suffered individual discrimination at the hands of NEIU. Plaintiffs reply that this is not the case: "[n]o recovery is being sought for the individual claims separate from the hostile environment claim." (Pls.'s Resp. at 15.) However, plaintiffs engage in a brief argument as to why both Smith and Reeves should survive summary judgment on individual Title VII race discrimination claims. The court agrees with plaintiffs.

A Title VII claim of race discrimination can be established in two ways: by direct

evidence or by the indirect method under the *McDonnell Douglas* burden-shifting analysis. *Essex v. United Parcel Serv. Inc.*, 111 F.3d 1304, 1308 (7th Cir. 1997); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Plaintiffs claim that the court need not engage in the *McDonnell Douglas* burden-shifting analysis, because plaintiffs have provided direct evidence of discrimination in this case. Specifically, plaintiffs point to "the remarks of Lt. Leenheer and others against African Americans and those who opposed discrimination." (Pls.' Resp. at 14.)

Under the direct method of proof, a plaintiff must show either "an acknowledgment of discriminatory intent by the defendant or circumstantial evidence that provides the basis for an inference of intentional discrimination." *Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001). "Direct evidence is evidence which, if believed by the trier of fact, will prove a particular fact in question without reliance upon inference or presumption." *Eiland v. Trinity Hosp.*, 150 F.3d 747, 751 (7th Cir. 1998) (citations omitted). A bigoted remark is "actionable only if it results in injury to a plaintiff; there must be a real link between the bigotry and an adverse employment action." *Gorence*, 242 F.3d at 762 (citations omitted).

Succeeding with the direct method of proof is rare. In the context of age discrimination, the Seventh Circuit has noted that "employers are fairly unlikely to be caught making statements such as, 'I fired Judy because she was an old woman.'" *Gorence*, 242 F.3d at 762. More often, employers may be caught saying something like "Old women are hard to deal with." *Id.* "The first statement proves intentional discrimination; the second, without more, does not. Inevitably, in cases we see, we deal with what falls in between." *Id.*

Plaintiffs have a good argument under the direct method. For example, Mindy Tran, a

former student aide at the PSD, submitted an affidavit in which she states that in the spring of 1997, she overheard Leenheer say: "I am going to get two motherfucking black niggers fired." (Tran Aff., Pls.' Ex. 27 ¶ 5.) Tran also states that in the summer of 1997 she heard Leenheer say: "Oh, those motherfucking niggers." (*Id.* ¶ 6.) Yamileth Valdes, another former student aide, corroborated the latter comment in her own affidavit. Delia Gomez (a.k.a. Delia Prondzinski), a key control clerk in the PSD, submitted an affidavit in which she states: "I heard Lieutenant Leenheer refer to African Americans as 'Black Motherfuckers.'" (Gomez Aff., Pls.' Ex. 29 ¶ 5.) In addition, Gomez says on March 31, 1997, Leenheer and Officer Durkin gave her a ride in a police car. They asked her if she knew who had submitted a complaint against Leenheer. (Smith and Reeves each had filed a charge with the EEOC on March 11, 1997.)[13] When Gomez told Leenheer that she did not know who made the complaint, "[h]e said he had heard someone complained against him and he was pissed. He said he was going to find out who reported him and do something about it." (*Id.* ¶ 7.) Although this evidence suggests some retaliatory motive by Leenheer, it is also clearly direct evidence of "acknowledgment of discriminatory intent." *Gorence*, 242 F.3d at 762.

An obstacle for plaintiffs, however, is that they must provide evidence linking Leenheer's offensive comments with an adverse employment action. *Gorence*, 242 F.3d at 762. The court has already concluded that the November 1997 suspensions of both Smith and Reeves constitute adverse employment actions. However, there is a question as to who did the suspending.

---

[13]Although Leenheer was not specifically mentioned in the charges, he and Connolly conducted the investigation that was the subject of Smith and Reeves's discipline.

Defendants argue that the decision-makers for Smith's suspension were Director Curtin and Gloria Carter. Smith and Reeves have not provided an explicit argument that Leenheer was a decision-maker in all of their disciplinary actions. The closest they come to an argument is when they summarily state: "The Plaintiffs' evidence shows that the remarks of Lt. Leenheer and others against African Americans and those who opposed discrimination tainted the employment decisions in this case." (Pls.' Resp. at 14.)

Nevertheless, viewing all the evidence in the light most favorable to Smith and Reeves, the court can infer that Leenheer had some influence over the decision to suspend both of them. The Seventh Circuit has said that although stray remarks are not per se discriminatory, it is different "when the decision makers themselves, or *those who provide input into the decision*, express such feelings (1) around the time of, and (2) in reference to, the adverse employment action complained of." *Hunt v. City of Markham, Illinois*, 219 F.3d 649, 652 (7th Cir. 2000) (emphasis added). In this case, there is evidence that (a) on March 11, 1997, Smith and Reeves filed a discrimination charge against NEIU; (b) on March 31, 1997, Leenheer said that he would find out who made a complaint against him and do something about it; (c) in the spring of 1997, Leenheer said that he would get "two motherfucking niggers fired"; and (d) in November 1997, both Smith and Reeves were suspended, based in part on the investigation by their supervisors, Leenheer and Connolly. In this situation, Leenheer's statements provide direct evidence of racial animus. Perhaps more importantly, however, the comments—that he would "do something" about the complaints against him and get two "niggers" fired—provide at least an inference that Leenheer was involved in the decision to suspend Smith and Reeves in November 1997, and in

the decision to seek Reeves's discharge in 1998. Although the remarks were made several months before the adverse employment action, Leenheer's language provides enough link between plaintiffs' discrimination charges and the November suspensions to create a genuine dispute. *Cf. Gorence*, 242 F.3d at 766 (holding that employer's remark asking for a protocol to get rid of older store mangers was not direct evidence of retaliation because it was made a year after any relevant employment decision). For this reason, the court holds that there are genuine issues of material fact regarding whether Smith and Reeves were subjected to racial discrimination in violation of Title VII. Defendants' motion for summary judgment is denied as to Smith and Reeves's intentional race discrimination claim in Count I.

2. *Weaver*

Plaintiffs have provided no argument that Weaver has established a prima facie case of individual race discrimination. Even upon review of the merits, the court concludes that Weaver cannot provide evidence that would support such a holding. As discussed above, Weaver has provided no evidence that she suffered an adverse employment action or endured a hostile working environment. Therefore, defendants' motion for summary judgment is granted as to Weaver's intentional race discrimination claim in Count I. That claim is hereby dismissed.

**II. Count II: Race Discrimination under § 1981**

In Count II, plaintiffs Smith, Reeves, and Weaver charge Leenheer and Connolly with hostile work environment race discrimination under § 1981. Defendants argue that plaintiffs have failed to set forth a prima facie case. Both parties rely on the same arguments for Count II that they raised as to Count I. However, there is an important distinction in this claim. In Count I,

where plaintiffs were required to show that NEIU was vicariously liable for the hostile work environment allegedly caused by the supervisors of plaintiffs, in Count II plaintiffs must show that Leenheer and Connolly each are responsible for the hostile environment.

It is well accepted that § 1981, like Title VII, provides a remedy for plaintiffs alleging race-based hostile work environment. In fact, courts analyze § 1981 claims in the same manner as claims brought under Title VII. *See, e.g., Bratton v. Roadway Package Sys., Inc.*, 77 F.3d 168, 175 (7th Cir. 1996). Generally speaking, a § 1981 plaintiff must allege that (1) he or she is a member of a racial minority; (2) the defendant intended to discriminate against the plaintiff on the basis of race; and (3) the defendant's activities concern the making, performance, modification, or termination of a contract, the enjoyment of the benefits of a contractual relationship, or the conditions of a contractual relationship. *Morris v. Office Max*, 89 F.3d 411, 413 (7th Cir. 1996).

A. Smith and Reeves

For the same reasons discussed in Count I, there is a genuine issue of material fact as to whether defendant Leenheer subjected Smith and Reeves to a hostile work environment, and whether he should be liable for intentional race discrimination. There is evidence that Leenheer used racial epithets when referring to Smith and Reeves, and evidence that both plaintiffs knew about his remarks. There is also evidence that Leenheer disciplined and assigned them to unwanted duties, while treating white officers differently. Finally, there is evidence that, based on Leenheer and Connolly's investigation, both Smith and Reeves were suspended without pay. This adverse employment action clearly concerned plaintiffs' enjoyment of their contractual

employment relationship with NEIU. Furthermore, there is direct evidence that Leenheer intentionally discriminated against both Smith and Reeves, resulting in their November 1997 suspensions, when he said that he would get "two motherfucking niggers fired." For these reasons, Leenheer's motion for summary judgment is denied as to Smith's and Reeves's § 1981 claims in Count II.

However, plaintiffs have not provided sufficient evidence to set forth a prima facie case against defendant Connolly on either a hostile work environment or intentional discrimination claim. There is no specific evidence that Connolly uttered racial epithets or expressed any intention to harm Smith or Reeves. The only evidence that points specifically to Connolly is Reeves's claim that Connolly assigned Smith and Reeves to desk duty, Reeves's claim that Connolly subjected him to a lengthy training program, and Connolly's investigation of Smith's and Reeves's visits to Diversions. This is not enough evidence to constitute a prima facie case of hostile work environment racial harassment. "[I]solated and innocuous incidents will not support a hostile environment claim." *McKenzie*, 92 F.3d at 480.

Furthermore, on the intentional discrimination claim, there is insufficient evidence to show that Connolly had any influence over plaintiffs' November 1997 suspensions. Although Connolly was part of the investigation on which the suspensions were based, there is no evidence that Connolly was involved in the *decision* to suspend plaintiffs or subject them to any other adverse employment action, unlike Leenheer. Plaintiffs must establish this fact, whether they utilize either the direct or indirect method of proof. Therefore, defendant Connolly's motion for summary judgment is granted as to Smith's and Reeves's hostile work environment and intentional

race discrimination claims in Count II.

B. Weaver

As with her Title VII hostile work environment claim in Count I, Weaver has failed to create an inference that Leenheer and Connolly's treatment of her was racially motivated, that she suffered an adverse employment action, or that racial discrimination altered the conditions of her employment. Therefore, defendants' motion for summary judgment is granted as to Weaver's hostile work environment and intentional discrimination claims in Count II.

**III. Count III: Retaliation under Title VII and § 1981**

In Count III, all four plaintiffs bring charges of retaliation against NEIU (under Title VII) and Leenheer and Connolly (under § 1981). Defendants ask for summary judgment on this count because each plaintiff has failed to set forth a prima facie case. Both Title VII and § 1981 forbid employers from retaliating against employees who have filed or supported the filing of charges of discrimination or otherwise sought to enforce antidiscrimination statutes. *See, e.g.*, *McDonnell v. Cisneros*, 84 F.3d 256, 262 (7th Cir. 1996) (holding that Title VII prohibits employers from retaliating against an employee due to his or her opposition to unlawful employment practices); *Adams v. City of Chicago*, 865 F. Supp. 445, 447 (N.D. Ill. 1994) ("Congress intended the new § 1981 to cover retaliation against an employee for filing an EEOC claim or enforcing any other antidiscrimination statute.").

Plaintiffs once again rely on the direct method of proof. However, they also argue that they should prevail under the indirect method. To establish a prima facie case of retaliation under Title VII or § 1981, a plaintiff must allege: (1) that he or she engaged in statutorily

protected expression; (2) that he or she suffered an adverse action by the employer; and (3) that there was a causal link between the protected expression and the adverse action. *See, e.g.*, *Drake*, 134 F.3d at 885 (stating elements for cause of action under Title VII); *Brown v. N. Trust Co.*, No. 96 C 838, 1997 WL 733910, *4 (N.D. Ill. Nov. 18, 1997) (holding that cause of action for retaliation under § 1981 has same elements as under Title VII). "Then the employer must present a legitimate, nondiscriminatory reason for its action and the plaintiff must establish pretext." *Gorence*, 242 F.3d at 765.

While insisting that the adverse action must be material to be actionable, the Seventh Circuit has defined such actions quite broadly:

> [A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

*Crady*, 993 F.2d at 136; *see also Collins v. Illinois*, 830 F.2d 692, 703-04 (7th Cir. 1987) (holding that materially adverse actions in the Title VII context can take many forms, such as outright dismissal, reduction of pay or benefits, transfer to another department or an isolated corner of the workplace, or directions to relocate one's personal files and to refrain from using the firm stationery or office services); *Knox v. Indiana*, 93 F.3d 1327, 1334 (7th Cir. 1996) (giving as examples of retaliatory adverse actions things "that put the complainant in a more unfriendly working environment: actions like moving the person from a spacious, brightly lit office to a dingy closet, depriving the person of previously available support services (like

secretarial help or a desktop computer), or cutting off challenging assignments"). On the other hand, "not everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *Drake*, 134 F.3d at 885 (quoting *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996)) (internal quotation omitted).

Defendants argue that each plaintiff has failed to satisfy either the second or third requirement for retaliation as set forth in *Drake*. They claim that none of the incidents cited by any plaintiff constitute adverse actions and that there is no causal link between plaintiffs' protected activities and the alleged adverse actions. Plaintiffs respond with a remarkably cursory argument in their joint brief in opposition to summary judgment. On page 17 of the response brief, plaintiffs generally state that "[t]he evidence here shows direct animus against persons who opposed discrimination." (Pls.' Resp. at 17.) While offering a similarly terse claim that they have satisfied the second requirement for retaliation, plaintiffs then offer a more protracted argument to support the causation element, stating that Leenheer told Guerrero that "it would be better if she did not support Smith." (*Id.*) Plaintiffs then argue that "this theme was repeated in action and deed for the time that plaintiffs had to suffer the 'Curtin administration' which was fully supported by NEIU." (*Id.* at 17-18.) Despite plaintiffs' attempts to lump their arguments together, this court must address each of their retaliation claims separately.

A. Smith and Reeves

Both Smith and Reeves withstand summary judgment on their retaliation claims against

Leenheer and NEIU, for reasons similar to those that support their racial discrimination claims. First, the parties do not dispute that Smith's and Reeves's March 1997 charges of discrimination against Leenheer constituted protected activity. In addition, the court has already concluded that both Smith and Reeves suffered an adverse employment action in their respective November 1997 suspensions. The court has also concluded that alleged remarks by Leenheer and his involvement in plaintiffs' investigation create a dispute regarding whether Leenheer was involved in the decision to suspend both Smith and Reeves. The remaining issue in this claim is whether the suspensions were made in retaliation for Smith's and Reeves's protected activity, a distinct issue from whether the suspensions were made because of their race.

There is at least some evidence suggesting that the suspensions were made in retaliation for the March 1997 discrimination charges. There is evidence that on March 31, 1997, Leenheer said that he would find out who made the complaint and do something about it; and in the spring of 1997, Leenheer said that he would get "two motherfucking niggers fired." (Tran Aff., Pls.' Ex. 27 ¶ 5.) This evidence creates at least a question as to whether the subsequent November 1997 suspensions were made in retaliation for the discrimination charges. In addition, there is a dispute as to whether NEIU's reasons for the suspensions were pretextual, considering Leenheer's statements and plaintiffs' evidence that the suspensions were unfounded. That is all plaintiffs need to survive summary judgment. Therefore, defendants NEIU and Leenheer's motion for summary judgment is denied as to Smith's and Reeves's retaliation claims in Count III.

On the other hand, Smith and Reeves have not provided sufficient evidence suggesting that Connolly had any involvement in their suspension, or otherwise retaliated against them.

Although Connolly was involved in the investigation leading to the November suspensions, there is no evidence linking Connolly to any retaliatory activity *after* plaintiffs' discrimination charges. Reeves claims that Connolly subjected him to an unwarranted training program, but that does not amount to an adverse employment action (i.e., termination, demotion, title change, loss of benefits, diminished responsibilities) or a hostile work environment (i.e., unreasonable interference with his employment). Otherwise, plaintiffs have utterly failed to link Connolly's conduct to an adverse employment action against either Smith or Reeves. Therefore, defendant Connolly's motion for summary judgment is granted as to Smith's and Reeves's retaliation claims in Count III.

B. Weaver

None of the many complaints that Weaver makes about Leenheer's and Connolly's conduct amounts to a retaliatory adverse employment action against her. Although courts have recognized that retaliation can take the form of a hostile work environment, *Drake*, 134 F.3d at 886, this court has already concluded that Weaver has failed to set forth a prima facie case of a hostile work environment. Otherwise, Weaver fails to provide evidence that creates an inference that she suffered any adverse employment action. The closest she comes is when she claims that on two occasions, Connolly refused to train her regarding new technology. While this may be offensive, this kind of behavior does not rise to the kind of adverse employment action contemplated by courts, such as dismissal, reduction of pay or benefits, transfer to another department, moving her to a dingy closet, or depriving her of previously available support services. She also claims she was threatened by Leenheer, but that also does not amount to an adverse action—she does not claim that Leenheer carried out his threat. Therefore, defendants' motion

for summary judgment is granted as to Weaver's retaliation claim in Count III.

C. Guerrero[14]

In addition to almost every complaint provided by Weaver, Guerrero also complains about incidents that involved her personally. First, she claims that in 1997, Dispatcher Judy Brewer hit her in the arm. She claims that when she and Weaver told Curtin about the incident, "he said it never happened." (Guerrero Dep., Pls.' Ex. 38, 21:11.) In addition, she also complains that the student workers under her supervision often complained that Leenheer called Reeves and Smith "assholes, son of a bitches, mother fuckers, black mother fuckers." (*Id.* at 22:8-9.) She also claims that Leenheer would often sit in his office in the dark and stare.

On December 6, 1997, Guerrero wrote a memo to Curtin complaining about the actions of Leyva. She claims that he came to her house during the summer of 1997 and talked to her two children, showing them his squad car. She claims that later her children told her that Leyva asked them if Guerrero ever hit them, to which they said "no."

Guerrero furthered testified that at one time she was supposed to attend a grievance involving Smith and Leenheer. She says that she was working one evening, and "Lieutenant Leenheer told me it would be best if I didn't have to go." (*Id.* at 25:1-2.) She also claims that on February 6, 1998, Leenheer threatened her; she claims that he "made the comment at a

---

[14]Defendants have moved to strike numerous exhibits and fact statements on which Guerrero relies to support her claims. However, the court need not resolve the issues raised in the motions because Guerrero's claims fail on the merits, even when considering everything she has submitted. Therefore, defendants' motions, to the extent they object to exhibits and fact statements that support Guerrero's claims, are denied as moot.

meeting that I needed to apologize to him for making false allegations about him." (*Id.* at 27:8-10.) She says Leenheer then indicated toward herself and Weaver and said "These two will be losing their homes." (*Id.* at 28:11.)

Guerrero claims that the reason that she filed her April 1998 affirmative action complaints was because "there was a lot of harm going on in our department" (*Id.* at 54:10-11) and "there's a lot of racial going on in there." (*Id.* at 54:16-17.) When asked to describe specifically what she meant, Guerrero testified: "You hear Lieutenant Leenheer always saying that he just hates Officer Lee Reeves and Officer Randy Smith." (*Id.* at 54:21-23.)

On February 10, 1998, Guerrero filed a complaint with the EEOC complaining of retaliation for her April 1997 affirmative action complaints. In the EEOC charge, Guerrero complains that in September 1997, Hamideh issued her two tickets on her car, one for not having car insurance and one for not having a registration sticker. She admits to not having the registration sticker, but claims that she proved to Hamideh that she had insurance. "[N]evertheless he gave me the ticket." (Guerrero Charge of Discrimination, Feb. 10, 1998, Pls.' Ex. 20 ¶ I.B.2.) In the same complaint, Guerrero cited the February 6, 1998 encounter with Leenheer during which she claims Leenheer threatened her and Weaver.

Guerrero has failed to set forth a prima facie case of retaliation. The only protected actions that she cites are her April 1997 affirmative action complaints. The only incidents after those complaints to which she points as retaliation are the summer 1997 visit by Leyva, the September 1997 tickets by Hamideh, and the February 6, 1998 threat by Leenheer. None of these events constitutes an adverse employment action, such as dismissal, loss of benefits, or loss

of support services. "[N]ot everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *Drake*, 134 F.3d at 885 (quoting *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996)) (internal quotation omitted). Even more importantly, none of the incidents even qualifies as an employment action, or a "materially adverse change in the terms and conditions of employment." *Crady*, 993 F.2d at 136. Rather, each incident either occurred outside the employment context altogether, or had no effect whatsoever on Guerrero's employment. *Cf. Drake*, 134 F.3d at 886 n.5 (rejecting plaintiffs' claim that their employer retaliated by refusing to hire their daughter, but recognizing that although past courts have required that retaliation be job-related, "recent cases have cast a significant shadow on the earlier view").

Furthermore, Guerrero provides no evidence to link any of these events to her April 1997 affirmative action complaints, other than the fact that they occurred soon thereafter. However, there is no evidence to show how the incidents are related to her complaints. Finally, Guerrero has provided no evidence indicating that the sum total of defendants' actions amounted to a hostile work environment which altered the conditions of her employment. Therefore, her retaliation claim fails. Defendants' motion for summary judgment is granted as to Guerrero's retaliation claim in Count III.

**IV. Count IV: First Amendment Violation under § 1983**

Finally, in Count IV, each plaintiff claims that defendants Leenheer and Connolly violated § 1983 by denying plaintiffs their rights under the First and Fourteenth Amendments. Specifically,

plaintiffs claim that Leenheer and Connolly "depriv[ed] Plaintiffs of their ability to complain about their unfair treatment and [subjected] employees to a hostile work environment or harassment by fellow employees because of their having exercised their rights." (Second Am. Compl. ¶ 67.)

Section 1983 "creates a federal cause of action for 'the deprivation, under color of [state] law, of a citizen's rights, privileges, or immunities secured by the Constitution and the laws of the United States.'" *Lalvani v. Cook County*, No. 98 C 2847, 2000 WL 198459, at *7 (N.D. Ill. Nov. 14, 2000) (quoting 42 U.S.C. § 1983), *aff'd and remanded by* 269 F.3d 785 (7th Cir. 2001). Defendants do not argue that Leenheer and Connolly were not acting under color of state law during any of the alleged incidents. To state a prima facie § 1983 claim for violation of First Amendment rights, a plaintiff must demonstrate that (1) his speech was constitutionally protected; (2) he suffered an adverse employment action; and (3) a causal connection exists between his speech and the adverse employment determination against him, so that it can be said that his speech was a motivating factor in the determination of the adverse action. *Singleton v. Chicago Sch. Reform Bd. of Trs.*, No. 00 C 395, 2000 WL 777925 (N.D. Ill. June 13, 2000); *Thomasen v. Romeis*, 198 F.3d 1022 (7th Cir. 1998). Once the plaintiff establishes all three elements, the burden shifts to the defendant to show by a preponderance of the evidence that it would have taken the same adverse employment action even in the absence of the protected conduct. *Thomasen*, 198 F.3d at 1022.

Defendants argue first that each plaintiff has failed to show that he or she engaged in constitutionally protected speech. Furthermore, defendants argue that each plaintiff has admitted that no one at PSD prevented them from complaining about the alleged discrimination.

Therefore, defendants argue, plaintiffs have not suffered any adverse employment action with regard to this count. Plaintiffs respond with cursory arguments. First, they claim that their speech was constitutionally protected because it regarded issues of public concern. Next, plaintiffs claim that they each suffered an adverse employment action because "the costs of the exercise of [plaintiffs' speech] rights was a hostile work environment." (Pls.' Resp. at 18.) As with Count III, despite plaintiffs' generic arguments, the court must consider each plaintiff's claims separately.

A. Smith and Reeves

It is undisputed that Smith's and Reeves's March 1997 discrimination charges filed with the EEOC are constitutionally protected speech. Therefore, the first requirement has been met. Furthermore, as the court has concluded above, the November 1997 suspensions of both Smith and Reeves were adverse employment actions. Finally, for reasons stated above, with respect to Leenheer, the court finds a disputed issue concerning whether Smith's and Reeves's discrimination charges were motivating factors in the determination of the adverse actions. Furthermore, there is a disputed issue as to whether NEIU would have suspended Smith and Reeves even if they never filed their discrimination charges. Therefore, Leenheer's motion for summary judgment is denied as to Smith's and Reeves's § 1983 claims in Count IV.

However, Smith and Reeves have provided insufficient evidence to indicate that Connolly was involved in the decision to suspend Smith and Reeves. While Connolly was involved in the investigation that led to the March 1997 discipline, there is no evidence implicating Connolly *after* Smith's and Reeves's protected speech. Furthermore, there is no

evidence that Connolly otherwise violated their First Amendment rights. Therefore, defendant Connolly's motion for summary judgment is granted with respect to Smith's and Reeves's § 1983 claims in Count IV.

B. Weaver

As discussed above, Weaver has failed to show that she suffered an adverse employment action at the hands of anyone at NEIU. Therefore, defendants' motion for summary judgment is granted as to Weaver's § 1983 claim of a First Amendment violation in Count IV.

C. Guerrero

For the same reasons discussed in Count III, Guerrero's § 1983 claim in Count IV also fails. Essentially, she has failed to show any adverse employment action after her 1997 affirmative action complaints, and has failed to show any link between her cited evidence and those complaints. Therefore, defendants' motion for summary judgment is granted as to Guerrero's § 1983 claim in Count IV.

**Conclusion**

For the foregoing reasons, defendant Connolly's motions for summary judgment are granted in their entirety and defendant Connolly is hereby dismissed from this case. All defendants' motions for summary judgment against plaintiffs Weaver and Guerrero are granted in their entirety; all of plaintiffs Weaver's and Guerrero's claims in this case are hereby dismissed. Defendants NEIU and Leenheer's motions for summary judgment against plaintiffs Smith and Reeves are denied in their entirety. In addition, defendants' motions to strike plaintiffs' exhibits

and fact statements are either granted or denied on the merits, as discussed in this opinion; or, to the extent that the court did not rely on disputed evidence, the motions are denied as moot.

ENTER:

JOAN B. GOTTSCHALL
United States District Judge

DATED: March 19, 2002