CERTIFIED COPY

# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 03-1196

RANDY SMITH, VICTORIA GUERRERO,
ANN WEAVER, and ELBERT LEE REEVES,

*Plaintiffs-Appellants,*

*v.*

NORTHEASTERN ILLINOIS UNIVERSITY
and GERALD LEENHEER,

*Defendants-Appellees.*

FILED
NOV 2 9 2004
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 98 C 3555 & 98 C 5580—Joan B. Gottschall, *Judge.*

ARGUED JANUARY 23, 2004—DECIDED NOVEMBER 4, 2004

Before BAUER, WOOD, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Plaintiffs Randy Smith, Victoria
Guerrero, Ann Weaver and Elbert Lee Reeves filed suit
against defendants Northeastern Illinois University
("Northeastern"), Gerald Leenheer, and Kevin Connolly.
Smith, Reeves and Weaver, all African American, alleged
that the defendants (Connolly and Leenheer are white) dis-
criminated against them on account of their race by creat-
ing and tolerating a hostile work environment in violation

of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* In addition, they, along with Guerrero, who is Latina, allege suffering racially motivated retaliation in violation of § 1981 and Title VII. All four plaintiffs also claim that the defendants violated their rights under 42 U.S.C. § 1983 and the First Amendment by depriving them of their ability to complain about their unfair treatment at defendants' hands and by subjecting them to a hostile work environment or harassment when they exercised their First Amendment rights.

On summary judgment, the district court dismissed all claims against defendant Connolly and all claims made by Weaver and Guerrero. Smith and Reeves' claims against the remaining defendants, Northeastern and Leenheer, proceeded to trial, at the conclusion of which a jury found for the defendants. Smith and Reeves then moved for judgment as a matter of law or a new trial, which the district court denied.

Weaver and Guerrero appeal the district court's grant of summary judgment on their hostile work environment and retaliation claims under Title VII. Smith and Reeves seek this court's review of the district court's denial of their motion for a new trial under Federal Rule of Civil Procedure 59. On appeal, plaintiffs do not pursue any claims against Connolly, so we treat him as no longer a party to this case. For the reasons given below, we affirm.

## I. Background

Unless otherwise indicated, the facts discussed are those that were before the district court on summary judgment. We view them in the light most favorable to the non-moving party. *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1048 (7th Cir. 2000); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Northeastern is a state university located in Chicago, Illinois and its Public Safety Department (the "Department") employs police officers and clerical staff. Plaintiffs Smith and Reeves and defendants Connolly and Leenheer were employed by the Department as police officers.[1] Plaintiff Weaver worked as an administrative aide and officer manager for the Department. Her duties included hiring all clerical staff and supervising three full-time clerks, including plaintiff Guerrero, a "day supervisor," as well as several student workers. William Curtin served as director of the department and Weaver's immediate supervisor.[2]

While plaintiffs present the facts on which they base their appealed claims in a rather muddled fashion,[3] what is clear is that the work environment at Northeastern's Public Safety Department was far from ideal. We first pro-

---

[1] While the Department's exact hierarchy is unclear, we agree with the district court's conclusion that the record demonstrates that there was a genuine issue of material fact as to whether Leenheer and Connolly were supervisors to Smith and Reeves. Smith described Leenheer as one of his supervisors in a March 1995 discrimination charge to the Illinois Department of Human Rights. Reeves testified in his deposition that Leenheer gave assignments to police officers, including himself and Smith. He also testified that Leenheer also disciplined them.

[2] Like the district court, we do not reach or resolve the question of whether Weaver also reported to Leenheer. Since we find that she did not show the existence of a hostile work environment, *see* section II.A.1., we need not examine employer liability.

[3] Plaintiffs' appellate brief provides a "laundry list" of factual allegations followed by an "argument" section in which the litany of unorganized factual allegations are prefaced or followed by conclusory statements. Plaintiffs' counsel should be well aware that courts are not to do counsel's work of organizing its arguments nor are they "in the business of formulating arguments for the parties." *U.S. v. McClellan*, 165 F.3d 535, 550 (7th Cir. 1999).

vide a general description of the work environment, highlighting key events, focusing on racist and other offensive comments, possible retaliatory or other questionable conduct, and employee factions.

## A. Incidences of Racist and Other Offensive Comments

The first instance of offensive commentary plaintiffs point to allegedly occurred in 1984. Gene Salecker, a white officer employed at the Department and not a party to this litigation, had a conversation with defendant Leenheer in which Leenheer referred to the father of a student protest leader as a "nigger." A few years later, in 1987, when Salecker was the only white officer assigned to the midnight shift, Leenheer telephoned Salecker at home and suggested that he transfer to the afternoon shift so that "all blacks would be on the midnight shift, all the 'donkeys' would be stuck on the midnight shift and they can fuck each other around." Leenheer apparently used the term donkeys to refer to blacks on a number of occasions during this time period.

Plaintiff Smith testified at his trial that in early 1992, while eating lunch in the break room, he overheard Leenheer ask if anyone in the break room had seen him. Leenheer was apparently unaware of Smith's presence. When no person responded affirmatively, Smith overhead Leenheer retort "I don't like working with the nigger anyway." Later in 1992, Leenheer arrested a black student named Victor Sellers. An officer informed Leenheer that Smith felt Sellers's arrest was racially-motivated. Salecker gave a statement to the Chief of Police that was supportive of Smith's perspective and conflicted with that of Leenheer and another officer, Robert Paprocki. Later, Paprocki called Salecker a "nigger-lover."

In 1993, Northeastern's Affirmative Action officer Margo Smith conducted an internal investigation filed by Smith against Leenheer, Director Curtin and others. In this investigation, she learned that Leenheer stated, "I am going to get these mother fuckers fired." This statement referred to plaintiffs Smith and Reeves.

In 1997, there were a number of incidents in which Leenheer was overheard using racial epithets. In the spring of that year, Mindy Tran, a student aide working at the Department, overheard Leenheer telling another officer, Hopeton Rowe, "I am going to get two motherfucking black niggers fired." Later that summer, with Leenheer standing near her desk, Tran and another student, Yamileth Valdes, heard Leenheer say, "Oh, those motherfucking niggers." Tran and Valdes complained to Guerrero about Leenheer's use of racial epithets. Plaintiff Weaver also once heard Leenheer call Smith and Reeves "black motherfuckers." Weaver's staff reported to her that Leenheer and Connolly were "constantly talking about Officer Reeves and Officer Smith and calling them derogatory names such as 'black niggers' and talking about them losing their jobs" which caused the students to be "scared." Delia Prondzinski, a full-time clerk working under Weaver's supervision, also heard Leenheer refer to African-Americans as "black motherfuckers" sometime in 1997.

## B. Possible Retaliatory or Otherwise Questionable Conduct

Plaintiffs' statement of facts describes numerous instances of complaints, and reactions by defendants to those complaints. As a result of Plaintiff Smith's criticism of the black student's arrest in 1992, Public Safety Department Director Curtin requested that the director of personnel discipline Smith on several grounds, including insubordination. Smith was suspended thirty days for which he submitted a grievance. Although Leenheer told Guerrero that "it would be best if [she] didn't have to go" testify at the

grievance hearing, she did testify. The grievance committee
upheld the grievance on seven of the eight counts, denied
it as to the insubordination charge, and reduced Smith's
suspension to one day, finding thirty days to be unduly harsh.

In April 1993, Plaintiff Smith filed an internal complaint
against various individuals, including Leenheer and Director
Curtin. A month later, Plaintiff Reeves prepared an inter-
nal memorandum to what he titled the "Department of Labor,"
where he expressed concern about discriminatory practices
in overtime, selection of the acting watch commander, and
the general atmosphere at the Public Safety Department.
Reeves also affirmed that Salecker told him that when he
worked on Leenheer's watch, Salecker would hear Leenheer's
"cronies" telling racist jokes.

In March 1995, Smith filed a discrimination complaint
with the Illinois Human Rights Commission. He claimed
that he was given a warning for parking in a restricted
parking space even though a white co-worker allegedly did
the same and was not disciplined. Smith also contended
that he was harassed and falsely accused of withholding
information in connection with his inability to catch African-
American individuals who had allegedly taken a stuffed ani-
mal from the school store. Smith stated that white officers
were not harassed or suspended for wrongdoing under sim-
ilar circumstances.

In March 1997, Smith and Reeves collectively filed dis-
crimination charges with the Illinois Department of Human
Rights. They alleged that Director Curtin demoted them from
acting watch commander to police officer because of their race.
The official reason given for Smith and Reeves's demotion
was that they had left their patrol areas without author-
ization. However, Smith and Reeves alleged that non-black
officers had done the same several times and had not faced
discipline.

Also in March 1997, Weaver, Guerrero and Prondzinski
complained to Director Curtin about Leenheer's treatment

of non-white personnel. At the end of that month, Leenheer offered Prondzinski a ride home. During the ride, Leenheer told Prondzinski that he knew that someone had filed a complaint against him. He asked her if she knew anything about it and mentioned that he "was going to do something about it." Feeling "highly upset" and "slightly intimidated," Prondzinski responded in the negative. After he dropped her off at a grocery store, Prondzinski telephoned Weaver crying and very upset about the incident.

The next day, Weaver wrote a memorandum to Director Curtin explaining the situation. In this memorandum, she stated that Leenheer expressed his intention to call Prondzinski at home. Weaver expressed concern that Leenheer was trying to "incite bad feelings" in the department. Weaver also indicated her intention to contact the Department's Affirmative Action Office.

Two days later, Director Curtin advised Leenheer of the complaint in general terms and reminded him of the Department's policy against harassment or hostile, offensive or intimidating behavior. About a week later, in April 1997, Weaver, Guerrero, and Prondzinski filed an internal complaint describing what they viewed as a growing number of racially-motivated incidents and retaliation. They requested an independent investigation. About a month later, Margo Smith of the Department's Affirmative Action Office informed Weaver that a firm had been selected to formally review the Department. In early August, Prondzinski resigned citing "turmoil and stress" in the Department that had not been handled. Also in August, someone slipped a cryptic anonymous letter under Weaver's office door, which she viewed as threatening.[4]

---

[4] The message read:

If you work for a man, in heaven's name work for him.
If he pays you wages that supply you bread and butter,
                                                   (continued...)

The external firm issued a final report in November 1997. The report identified personality clashes but made no finding of racial discrimination. The report was shared with Department employees in December 1997.

Dissatisfied with the report, Weaver urged the Department to hire experts to address racial discrimination. Northeastern responded by retaining Quest Consultants, which issued a final report in June 1998. Quest's report concluded that while Leenheer's behavior "does need to be redirected and properly managed," and the facts presented suggested tensions in the workplace which "may appear racial in nature on the surface," in the end, the facts "do not appear to support claims of racial discrimination."

In the meantime, a number of additional events happened. In December 1997, Officer Leyva stopped by Guerrero's home and asked her foster children if she ever hit them. The children responded no. Smith filed another charge of discrimination with the Illinois Department of Human Rights in January 1998. In February 1998, Leenheer stated at a meeting that Weaver and Guerrero had made false allegations against him. He demanded an apology, and said that "those two will be losing their homes." A few days after the meeting, Guerrero and Weaver again filed discrimination charges with the Illinois Department of Human Rights. They claimed

---

[4] (...continued)

work for him; speak well of him; stand by him and stand by the institution he represents. If put in a pinch, an ounce of loyalty is worth a pound of cleverness. If you must vilify, condemn and eternally disparage, resign your position and when you are outside, damn to your heart's content, but as long as you are part of the institution do not condemn it. If you do that[,] you are loosening the tendrils that are holding you to the organization and, at the first high wind that comes along[,] you will be uprooted and blown away, and probably you will never know the reason why.

retaliation for filing an internal affirmative action complaint in April 1997; harassment in the form of issuance of tickets in September 1997 (Officer Hamideh, who reports to Leenheer, issued Guerrero tickets for lacking a registration sticker and for not having insurance, the latter of which was allegedly untrue); and for perceived threats, namely the cryptic anonymous letter, and Leenheer's "losing their homes" comment.

## C. Employee Factions

Officer Dwight Pearson indicated that by the time he began working at the Department in 1997, most of the Department staff had been divided according to race or opposition to racial discrimination. The Department had been divided into two groups, informally known as the "A team" and the "B team." Smith testified that Leenheer was the person responsible for the creation of these teams, and deciding who belonged to each. According to Pearson, the "A team" consisted of Director Curtin, Leenheer, Connolly, Leyva, Hopeton Rowe, Robert Parocki and Leenheer's wife, Chris Leenheer. All officers on the "A team" were white, with the possible exception of Rowe who was Jamaican and apparently did not consider himself black. The "B team" was comprised of Smith, Reeves, Donna Higgins, Pearson, Derrick Spenser and Salecker. Smith, Reeves, Spenser, and Pearson were black, while Higgins and Salecker were white. Plaintiffs perceived that the "A team" enjoyed more latitude on the job, while the "B team" was limited and often disciplined for engaging in the same actions as the "A team."

## II. Discussion

### A. Claims Dismissed on Summary Judgment

We review a district court's grant of summary judgment *de novo*, construing all facts and inferences in the light

most favorable to the non-moving party. *Tutman*, 209 F.3d at 1048; *Anderson*, 477 U.S. at 255. Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Tutman*, 209 F.3d at 1048 (quoting Fed. R. Civ. P. 56). *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

### 1. Weaver's Hostile Work Environment Claim

Plaintiff Weaver alleges that she experienced racial discrimination in the form of a hostile work environment in violation of Title VII. That statute makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race. . . ." 42 U.S.C. § 2000e-2(a)(1). To survive summary judgment on a hostile work environment claim against an employer under this provision, the employee must show: "(1) he was subject to unwelcome harassment; (2) the harassment was based on his race; (3) the harassment was severe or pervasive so as to alter the conditions of the employee's work environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability." *Williams v. Waste Mgmt. of Ill.*, 361 F.3d 1021, 1029 (7th Cir. 2004). *See also Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1043 (7th Cir. 2000). In evaluating the severity and pervasiveness of the conduct, we examine "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Russell v. Bd. of Trustees of Univ. of Ill. at Chicago*, 243

F.3d 336, 343 (7th Cir. 2001) (internal citations omitted).
Ultimately, to satisfy the "severe or pervasive" prong, the
plaintiff must show that the work environment was both
subjectively and objectively offensive. *Robinson v. Sappington*,
351 F.3d 317, 329 (7th Cir. 2003). In other words, the en-
vironment must be "one that a reasonable person would
find hostile or abusive, and one that the victim in fact did
perceive to be so." *Cerros v. Steel Technologies, Inc.*, 288 F.3d
1040, 1045 (7th Cir. 2002).

The district court found that Weaver did not make out a
*prima facie* case for hostile work environment in large part
because she failed to show how her work environment was
both subjectively and objectively hostile. While Weaver did
allege that she subjectively experienced her work environ-
ment as hostile (she claimed "It was deteriorating my life"),
we agree with the district court that she did not sufficiently
show her work environment to be objectively hostile within
the meaning of Title VII. Unlike the plaintiff in *Hrobowski
v. Worthington Steel Company*, 358 F.3d 473, 477 (7th Cir.
2004) who was "repeatedly subjected to hearing the word
'nigger,'" Weaver never personally heard Leenheer utter the
word. Moreover, what Weaver did actually hear Leenheer
say—calling Smith and Reeves "black motherfuckers"—
was only on one occasion over her multiple years as an em-
ployee of Northeastern. Referring to colleagues with such
terms is hardly admirable, and is in fact deplorable. How-
ever, "the mere utterance of an . . . epithet which engenders
offensive feelings in an employee is not sufficient to estab-
lish a hostile work environment." *McPhaul v. Bd. of
Commissioners of Madison County*, 226 F.3d 558, 567 (7th
Cir. 2000) (quoting *Harris v. Forklift Systems*, 510 U.S. 17,
21 (1993)). One utterance alone does not create an objectively
hostile work environment.

There is no hostile work environment where as here, the
harassment about which Weaver complains was not directed

at her. Weaver's clerical staff informed her that they heard Leenheer on a number of occasions refer to Smith and Reeves as "motherfucking black niggers" or "motherfucking niggers." Moreover, on the single occasion Weaver overheard Leenheer use the racially-tinged offensive words "black motherfuckers", the words were not directed at her.

While certainly relevant to the determination of a hostile work environment claim, when harassment is "directed at someone other than the plaintiff, the 'impact of [such] 'second-hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff." *Id.* (quoting *Gleason v. Merisow Fin., Inc.*, 118 F.3d 1134, 1144 (7th Cir. 1997)). *See also Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 938 & n.8 (7th Cir. 1996). *Cf. Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1274 (7th Cir. 1991) (affirming a judgment for hostile work environment plaintiff, noting that harassment was directed at plaintiff personally and for a period of months).

We do not mean to hold that a plaintiff can never demonstrate a hostile work environment through second-hand comments or in situations where a plaintiff is not the intended target of the statements. However, what Weaver personally experienced does not amount to an objectively hostile work environment. She heard an offensive term directed at a third person once and only learned from others about other offensive comments directed at third persons. The district court did not err when it dismissed her hostile work environment claim on summary judgment.

## 2.  Weaver and Guerrero's Retaliation Claims

Weaver and Guerrero claim that the defendants retaliated against them by creating and tolerating a hostile work environment when they complained about their alleged

unfair treatment.[5] Title VII makes it "unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Under Title VII, "unlawful retaliation occurs when an employer takes an adverse employment action against an employee for opposing impermissible discrimination." *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 980-81 (7th Cir. 2004) (internal citations omitted). The plaintiffs may pursue their retaliation claim under the direct or indirect method. *Id.* at 981. Under the direct approach, which Weaver and Guerrero employ, they must each show, using either direct or circumstantial evidence, that they: (1) engaged in a statutorily protected activity; (2) suffered an adverse employment action taken by the employer; and (3) a causal connection between the two. *Id. See also Russell*, 243 F.3d at 344.

In this circuit, we construe adverse action taken in retaliation quite broadly. *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996). *See also Knox*, 93 F.3d at 1334 (describing retaliatory adverse actions as that which "put the complainant in a more unfriendly working environment: actions like moving the person from a spacious, brightly lit office to a dingy closet, depriving the person of previously available support services (like secretarial help or a desk-

---

[5] The creation of a hostile work environment can be a form of retaliation. *See Knox v. State of Ind.*, 93 F.3d 1327, 1334 (7th Cir. 1996) ("There is nothing in the law of retaliation that restricts the type of retaliatory act that might be visited upon an employee who seeks to invoke her rights by filing a complaint. . . No one would question the retaliatory effect of many actions that put the complainant in a more unfriendly working environment. . .").

top computer), or cutting off challenging assignments"). However, we have noted that "not everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *Smart*, 89 F.3d at 441 (internal quotations omitted).

While Weaver and Guerrero undisputedly satisfy the first element, as they made an informal complaint to Director Curtin in March 1997, filed an internal complaint in April 1997, and filed a discrimination charge with the Illinois Department of Human Rights in February 1998, we find that the plaintiffs failed to show they suffered an adverse employment action.

We already concluded in Part II.A.1 above that Weaver has not made out a valid hostile work environment claim. To bolster her retaliation-by-hostile-work-environment claim, she points us to additional events: (1) Leenheer intimidated Prondzinski when he gave her a ride home in March 1997, inquiring about a complaint lodged against him and saying that he "was going to do something about it"; (2) Weaver received an anonymous cryptic letter slipped under her office door in November 1997, which she found threatening; and (3) in February 1998, Leenheer pointed to Weaver and Guerrero at a meeting saying "those two will be losing their homes." It is unclear if Weaver felt in any way threatened by what Prondzinski experienced. While Weaver did feel threatened by the anonymous note she received in November 1997, what it conveys, *see supra* n.4, is too oblique to be construed as severe under Title VII. Finally, while the "losing their homes" comment certainly gives us pause, the record does not show Leenheer had any intent to act on his words. On this record, therefore, we construe the statement as more of an empty threat than a seriously contemplated declaration of an intent to do harm.

On balance, the events Weaver points to amount to isolated incidents, none of which is serious enough to create an abusive environment that altered Weaver's employment. *See, e.g., Adusumilli v. City of Chicago*, 164 F.3d 353, 361 (7th Cir. 1998) (stating "isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment" (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998))).

Guerrero too has not demonstrated retaliation actionable under Title VII. The protected action Guerrero points to is her April 1997 internal complaint. In addition to the events Weaver discusses, Guerrero directs our attention to the following: (1) Leyva's visit to her home and conversation with her foster children; (2) issuance of tickets by Hamideh; and (3) Leenheer's "losing their homes" statement. Leyva's visit to Guerrero's home is certainly suspect, as any parent would be concerned about a police officer coming to his or her home to make inquiries about child abuse. However, Guerrero fails to explain how this curious act affected her employment conditions or her ability to do her job. The same applies to the issuance of the tickets and Leenheer's oblique comment. Again, the Supreme Court has "made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment." *Faragher*, 524 U.S. at 788.

Guerrero points us to *Ray v. Henderson*, 217 F.3d 1234 (9th Cir. 2000) to support her claim; however, that case is readily distinguishable. The *Ray* court found "that Ray suffered cognizable adverse employment actions when his employer, in retaliation for Ray's complaints concerning management's treatment of women employees, eliminated employee meetings, eliminated its flexible starting time policy, instituted a 'lockdown' of the workplace, and cut Ray's salary." *Id.* at 1237. No such actions were levied against Guerrero or her work position. In addition, the Ninth Circuit found Ray had stated a claim of retaliation by hostile work environment when the employer "regularly yelled at [Ray]

during staff meetings; they called him a 'liar,' a 'trouble-maker,' and a 'rabble rouser,' and told him to 'shut up.' Additionally, Ray was subjected to a number of pranks, and was falsely accused of misconduct. . . [and] his supervisors ma[d]e it harder for Ray to complete his own tasks. . ." *Id.* at 1245. Guerrero did not establish that the actions she complains of made it harder for her to do her job. In sum, the district court did not err when it dismissed Weaver and Guerrero's retaliation claims on summary judgment.

## B. Smith and Reeves's Request for a New Trial

Smith and Reeves's claims proceeded to trial and the jury returned a verdict in the defendants' favor. Smith and Reeves now seek review of the district court's denial of their motion for a new trial under Fed. R. Civ. P. 59(a). On review of such a motion, "[a] party seeking to reverse a district court's denial of a motion for a new trial bears a particularly heavy burden, [for a] motion for a new trial should succeed [o]nly when a verdict is contrary to the manifest weight of the evidence. . . ." *Research Sys. Corp. v. IPSOS Publicite*, 276 F.3d 914, 921 (7th Cir. 2002) (internal citations omitted). In addition, as the district court saw the presentation of the evidence and observed the witnesses, "[o]nly if the district judge has abused her discretion will we disturb her decision to deny a new trial." *Id.*

Smith and Reeves make two arguments to support their motion, both of which are cursory. Apparently addressing the weight of the evidence, their argument consists of a single sentence: "To fail to correct the present verdict will leave Defendants with the mistaken impression that it is legal and protected activity to create a vile, loathsome[,] intimidating environment against persons based on race. . ." This undeveloped argument constitutes waiver. *See Tyler v. Runyon*, 70 F.3d 458, 464 (7th Cir. 1995) ("We have made it clear that a litigant who fails to press a point by supporting it with pertinent authority, or by showing why it

is sound despite a lack of supporting authority, forfeits the point."); *see also Otto v. Variable Annuity Life Ins. Co.*, 134 F.3d 841, 854 (7th Cir. 1998) ("This court has refused to consider unsupported or cursory arguments."); *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived. . .").

Smith and Reeves's second argument in support of their Rule 59 motion is similarly thin. They claim that the district court abused its discretion when it "repeatedly" allowed defendants to "inject new witnesses and evidence not in the final pretrial order." However, they only describe one instance in which this took place (concerning witness Carol Martin) and only discuss the issue in two sentences. As defendants point out in their brief, and the trial transcript clearly demonstrates, plaintiffs' attorney agreed to allow Martin to testify.[6] Plaintiffs cannot complain about the

---

[6] The trial transcript reads as follows:

| [Defense counsel]: | There is another witness here, but we were going to put on Ms. Martin next. |
|---|---|
| THE COURT: | I have to hear the testimony because there is disagreement. What do you think she said, Mr. Andry [plaintiffs' counsel]? |

. . . .

| [Plaintiffs' Counsel]: | We may have an agreement here. If counsel simply wants to put her on to say that she wasn't working there in 1997 and didn't hear any racially derogatory comments by Leenheer, fine. I don't have a problem with that. |
|---|---|
| THE COURT: | Is that what you want to do? |

(continued...)

admission of testimony to which they agreed. Nor can they show that Martin testified beyond the scope plaintiffs contemplated. Under direct examination, her testimony was simply that she did not hear Leenheer use any racially-derogatory terms. Through cross-examination, plaintiffs' counsel clarified that Martin's testimony concerned the time period beginning in 1998 onwards and not 1997, because she was not yet employed by the Department. This testimony is consistent with what plaintiffs' counsel agreed to on the record.

## III. Conclusion

For the reasons stated herein, we AFFIRM the district court's dismissal of Weaver and Guerrero's claims on summary judgment and its denial of Smith and Reeves' request for a new trial.

---

[6] (...continued)

| | |
|---|---|
| [Defense Counsel]: | We talked briefly about that. We're not totally opposed to that if the Court thinks that's better. |
| THE COURT: | Fine. Let's do it. |
| [Plaintiffs' Counsel]: | But that's all. |
| THE COURT: | Well, you know, if you can't answer yes-or-no questions, how do you expect the witnesses—Is that agreeable? Yes or no. |
| [Defense Counsel]: | The fact that she's not there in '97 and that she didn't hear from Leenheer any racially derogatory terms, and didn't tell that to anyone. |
| [Plaintiffs' Counsel]: | Fine. She couldn't tell that to anyone if she wasn't there. |
| [Defense Counsel]: | I think that's agreeable. |
| THE COURT: | Okay. Excellent. |

A true Copy:

      Teste:

_Clerk of the United States Court of_
_Appeals for the Seventh Circuit_